UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 18-2333 (DSD/HB)


Barry Segal,

    Plaintiff,

v.              **ORDER**

Metropolitan Council,
d/b/a Metro Transit,

    Defendants.


  This matter is before the court upon the cross-motions for summary judgment and partial summary judgment by defendant Metropolitan Council and plaintiff Barry Segal.  Based on a review of the file, record, and proceedings herein, and for the following reasons, defendant's motion is granted and plaintiff's motion is denied.


**BACKGROUND**

  This dispute arises out of alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, the Rehabilitation Act, 29 U.S.C. § 794, federal regulations relating to those laws, and the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.12.

## I.   Governing Anti-Discrimination Laws and Regulations

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act establishes the same requirements for entities that receive federal funding. 29 U.S.C. § 794. Like the ADA and the Rehabilitation Act, the MHRA prohibits discrimination "against any person in the access to, admission to, full utilization of or benefit from any public service" because of a disability, and requires covered entities to "ensure physical and program access for disabled persons." Minn. Stat. § 363A.12, subdiv. 1.

These laws were passed for the purpose of addressing and correcting the history of inequality that disabled persons have faced in attempting to access public services. See 42 U.S.C. § 12101; 29 U.S.C. § 794; Minn. Stat. §§ 363A.02, 363A.12. In passing these laws, Congress and the Minnesota legislature recognized the discrimination disabled persons historically faced, and sought "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7). Both the ADA and the MHRA recognize the importance of providing disabled persons with equal

access to transportation services.  Id. § 12101(a)(3); Minn. Stat. § 363A.12, subdiv. 2.

Congress tasked the Department of Justice and the Department of Transportation (DOT) with developing regulations to implement the goals of these acts.  See, e.g., 42 U.S.C. § 12134.  Relevant to this action are two DOT regulations concerning the provision of services by transportation entities and the training those entities provide their personnel.  The first is a regulation requiring that,

> [w]here vehicles or other conveyances for more than one route serve the same stop, the entity shall provide a means by which an individual with a visual impairment or other disability can identify the proper vehicle to enter or be identified to the vehicle operator as a person seeking a ride on a particular route.

49 C.F.R. § 37.167(c).  The second regulation requires transportation entities to train their personnel "to proficiency" so that they may safely and properly assist persons with disabilities.  Id. § 37.173.

## II.  The Parties

Defendant Metropolitan Council is a regional planning agency and policy-making body that provides essential services to the Twin Cities metropolitan area.  These services include those provided by Metro Transit, a division of the Metropolitan Council, which provides rail and fixed-route bus services throughout the

metro area.[1]  Answer ¶ 1; see also Def.'s Mem. Supp. Summ. J., ECF No. 66, at 2.  In 2019, Metro Transit provided just under fifty-two million bus rides.  See Metro Transit, Metro Transit Facts, https://www.metrotransit.org/metro-transit-facts (last visited Nov. 23, 2020).

Segal is a DeafBlind individual, meaning he has extremely poor vision and is profoundly deaf.  Segal Decl., ECF No. 62, ¶¶ 3, 8, 10; see also Joint Ex. 10, ECF No. 60, at 10–13 (hereinafter, Ex. J-10).[2]  During the warmer months, Segal uses Metro Transit buses to travel between his home in Minneapolis, Minnesota, and his work in St. Paul, Minnesota, and also to travel to various appointments.  Segal Decl. ¶ 18; Ex. J-10, at 19–20.

## III. Segal's Complaints

Monday through Friday, Segal typically rides two buses each way to get to and from work and he often transfers at the University of Minnesota West Bank bus stop on Washington Avenue, which services multiple bus routes.  Segal Decl. ¶ 28; Ex. J-10, at 19–24.  Segal has been taught by orientation and mobility trainers

---

[1]   The court will refer to defendant as Metro Transit.

[2]   The parties submitted a set of joint exhibits, filed together at ECF No. 60.  The court will refer to these exhibits as the parties do, with a "J" to signify a joint exhibit followed by the exhibit number.

how to independently navigate the bus system in the Twin Cities.
Segal Decl. ¶¶ 33-38; Ex. J-10, at 38-40, 48-51, 53, 57, 78-79.
Through this training, Segal learned to identify and wait at the
transit bus stop sign (T-sign) at each stop.  Segal Decl. ¶ 34;
Ex. J-10, at 38-40.  This allows Segal to communicate with bus
operators regarding route information and to safely board buses.
See Segal Decl. ¶ 23.

Metro Transit bus operators are supposed to pull up to the T-
sign to allow waiting passengers to board and to communicate route
information to those who need it.  See, e.g., Exs. J-1, J-2, J-3.
At stops servicing multiple routes, if a second bus arrives behind
a bus already at the T-sign, the second bus is supposed to pull
forward to the T-sign to allow passengers to board and to
communicate the route information once the first bus leaves.  See,
e.g., id.

Segal's claims center on two issues, which the parties
characterize as the "T-Sign issue" and the "second bus issue."
With regard to the T-sign issue, Segal asserts that Metro Transit
buses serving the routes he rides regularly fail to pull up to the
T-sign to allow him to determine whether the bus is one he wishes
to ride.  Compl. ¶ 3; Segal Decl. ¶ 29.  Concerning the second bus
issue, Segal contends that Metro Transit buses that arrive after
a first bus is already at the T-sign regularly fail to pull forward

to the T-sign after the first bus clears, making it impossible for him to ascertain whether that second bus was one he wished to ride. Compl. ¶ 4; Segal Decl. ¶ 30.   In turn, Segal argues, these failures by the Metro Transit bus operators violate the above-mentioned DOT regulations and his rights under the ADA, Rehabilitation Act, and the MHRA.

Because Segal is DeafBlind, he is unable to hear when a Metro Transit bus approaches a stop.   Segal Decl. ¶¶ 21–22.   When one does arrive, he is only able to see the vague outline of the bus but is unable to see the specific route information typically displayed on the bus.   Id.   Thus, when a Metro Transit bus fails to stop at the T-sign, it is extremely difficult, and at times unsafe, for Segal to try to navigate to the bus doors to communicate with the operator about the route information.   See id. ¶¶ 12–13, 23; see also Ex. J-17, at 15.   When a second bus leaves without pulling forward to the T-sign, Segal is forced to wave his hands to try to get the attention of the operator.   Segal Decl. ¶ 31.   He has, at times, had to chase after a bus that left before he was able to determine the route information.   See Macpherson Decl. Ex. 8(b).   Because of these incidents, Segal has been late to work approximately five to ten times and has missed approximately three appointments since 2016.   Segal Decl. ¶ 32. In addition to causing him to be late to work or miss appointments,

these situations leave Segal feeling frustrated, worried, anxious, and oppressed. Id. ¶ 31.

## IV. Metro Transit's Investigation of Segal's Complaints

Between September 22, 2016, and March 9, 2020, Segal rode a Metro Transit bus 1,791 times. Ellingstad Aff. ¶ 3; id. Ex. 1. Segal first complained of the above issues on September 22, 2016. Between that date and December 3, 2019, Segal submitted 150 complaints to Metro Transit regarding the T-sign and second bus issues.[3] Ellingstad Aff. ¶ 38; Ex. J-8. Segal submitted a complaint every time he thought one of these two issues occurred, regardless of whether he believed the offending bus was one he wished to ride. Ex. J-10, at 28-31.

Metro Transit typically receives complaints through its Customer Relations Department and then, when such complaints involve buses failing to arrive or arriving late, works to verify those complaints through GPS data. Ex. J-11, at 26, 76, 82-83. After Metro Transit determines whether or not a complaint is verified, it then takes steps it deems appropriate to remedy the situation. Ex. J-11, at 76-80. After Segal's first complaint,

---

[3] In addition to Segal's complaints, between March 17, 2015, and December 6, 2019, Metro Transit received approximately 150 complaints regarding these issues from other people with disabilities. Goetz Decl. Ex. 7; see also Exs. J-7A, J-7B, J-7C, J-12, at 244-45.

Metro Transit's Director of Bus Operations Christy Bailly spoke with him about the incident and what Metro Transit should do moving forward. Ellingstad Aff. Ex. 3; Ex. J-14, at 67–68. As Segal's complaints became more frequent, Bailly began to personally investigate and attempt to verify each one. See Ex. J-12, at 187–93.

To investigate, Bailly would request the video from all of the buses present at the location and time of Segal's complaints. Id. at 130–31, 187–93. With regard to the T-sign issue, Bailly considered a complaint verified if she determined from the videos that Segal was standing at the T-sign and the bus did not stop precisely at the T-sign. Id. at 188–90. To determine whether the bus properly stopped at the T-sign, Bailly would look to see whether she could see Segal within the frame of the bus's open doors. Id. Bailly considered a complaint verified even if, after first stopping short, the bus subsequently pulled precisely up to the T-sign, and regardless of whether it appeared that the bus stopping short hindered Segal's ability to effectively communicate with the operator. Id. 189–90, 192–93. Bailly considered a complaint unverified when she could not determine that Segal was present at the stop or if, from the video, she determined that the bus did stop at the T-sign. Id. at 190. With regard to the second bus issue, Bailly would watch the videos to verify whether a second

8

bus left a stop at which Segal was waiting without pulling forward to the T-sign after a first-arriving bus left.  See id. at 192–93.

Of Segal's 150 complaints, Bailly verified seventy-four of them.[4]  Exs. J-6A, J-8; Ellingstad Aff. ¶¶ 36(a), 38.  After verifying a complaint, Bailly would instruct the offending operator's manager or garage manager to address the issue with the operator in a way consistent with the collective bargaining agreement that governs discipline of bus operators.  Ex. J-11, at 26–27.  Verified complaints such as Segal's typically result in training, coaching, or verbal counseling for the bus operator's first violation; repeated violations can result in formal warnings or termination.  Id. at 26–27, 46–48.  Bailly determined that sixty-one bus operators were responsible for the seventy-four verified incidents.  Ex. J-6A; Ellingstad Aff. ¶ 13.  Of Metro Transit's 1,500 bus operators, only thirteen operators committed more than one violation, and only two committed a second violation

---

[4]  Segal disputes that only seventy-four of these complaints should have been verified, but submits that even seventy-four verified complaints prove that Metro Transit violated the applicable DOT regulations, the ADA, the Rehabilitation Act, and the MHRA.  See ECF No. 61, at 10 n.6.  As discussed below, the court's analysis does not change regardless of whether it considers all 150 complaints or only the 74 verified complaints.

after receiving coaching.[5]   Exs. J-6A, J-6B, J-14, at 12-22;
Ellingstad Aff. ¶ 36(b), (c); id. Exs. 26, 27.

## V.   Metro Transit's Policies and Training

Metro Transit trained its bus operators on where to stop when
picking up riders with visual impairments or other disabilities
even before Segal began submitting his complaints.   Ex. J-13, at
20, 22; Ex. J-11, at 49.   That training occurred at new-hire part-
time operator training sessions and at full-time operator training
sessions.[6]   Ex. J-13, at 20-21.   The training instructed bus
operators to stop at the T-sign where disabled passengers had,
similarly to Segal, been taught to wait, or to stop wherever a
disabled passenger was waiting if not at the T-sign.   Id.

In November 2017, Metro Transit implemented new or adapted
policies and training to address Segal's complaints.   See, e.g.,
Exs. J-1.   Among these was a "Where to Stop" policy and bulletin
that specifically addressed Segal's complaints regarding the T-
sign issue and second bus issue.   Id.   Metro Transit issued this
bulletin several times, changing the formatting to emphasize

---

[5] The other eleven operators committed their second violation
before Bailly was able to verify the first violation and therefore
order further coaching, training, or counseling.   See Ex. J-14, at
21-22.

[6] Metro transit's newly hired bus operators begin as part-
time operators and then must apply to become full-time operators.
Ex. J-13, at 15-16.

different parts and to encourage bus operators to retain the information.  See Exs. J-1, J-2; Ellingstad Aff. Exs. 11-16; see also Ex. J-11, at 53, 56-57.  The bulletin is posted in Metro Transit garages and bus operators are required to view the bulletins before beginning their routes.  Ex. J-13, at 80; Ex. J-11, at 41.  The bulletin is also included in the training booklet that bus operators receive.  Ex. J-13, at 80; Ellingstad Aff. Ex. 17.

Metro Transit also created a Where to Stop video that was shown during bus operator training sessions and was played on a loop on certain days in all five of Metro Transit's garages.  Ex. J-13, at 21; see Macpherson Decl. Ex. 11.  Finally, Metro Transit provided training specific to issues faced by blind and deaf riders at both its part-time and full-time operator training sessions, as well as at its yearly Professional Operator Development sessions. Ellingstad Aff. Ex. 18; Ex. J-13, at 21.

Metro Transit also took efforts to ensure that bus operators servicing Segal's route were following these policies.  In August 2018, Metro Transit issued messages reminding operators on Segal's route of its Where to Stop policy through its "Store and Forward" messaging program.  Ellingstad Aff. Ex. 28; Ex. J-15, at 119-20. This program allows supervisors to send messages through the computerized devices on Metro Transit's buses, and bus operators

view these messages before leaving the terminal for their shift. Ellingstad Aff. Ex. 28; Ex. J-15, at 118–20.   In addition to sending these messages, from October 3, 2019, through November 11, 2019, Metro Transit placed transit supervisors at the University of Minnesota West Bank stops during the time Segal usually rides the bus to ensure that buses were following the Where to Stop policy.[7]  Ex. J-15, at 134, 139; Ellingstad Aff. Exs. 29, 30.

## VI.  This Action

Segal filed suit against Metro Transit on August 9, 2018. Segal now moves for partial summary judgment, arguing that he has established that Metro Transit is liable for violations of the ADA, Rehabilitation Act, and MHRA.   ECF No. 51.   Metro Transit also moves for summary judgment on the issues of liability and Segal's requests for damages and injunctive relief.   ECF No. 53. Metro Transit argues that Segal has not established violations of the ADA, Rehabilitation Act, and MHRA.   Metro Transit also contends that, even if Segal has established violations of these laws, he has not met the standard required to recover the damages and injunctive relief he seeks.

---

[7]  Metro Transit chose to place supervisors at the West Bank stops because, of Segal's seventy-four verified complaints, sixty occurred there.  Ex. J-6A; Ellingstad Aff. ¶ 36(c).

## DISCUSSION

I.  **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element

13

necessarily renders all other facts immaterial.  Celotex, 477 U.S. at 322-23.

## II.  Violation of ADA, Rehabilitation Act, and MHRA

Segal brings his claims under the ADA, the Rehabilitation Act, and the MHRA, and has set forth two theories under which he argues that Metro Transit has violated these laws.  The first theory is that Metro Transit has violated DOT regulations that require Metro Transit to provide appropriate service to disabled persons and to provide adequate training to personnel.  See 49 C.F.R. §§ 37.167(c), 37.173.  Because these regulations were enacted to implement disability anti-discrimination laws, Segal argues that those violations, in turn, amount to violations of the ADA, Rehabilitation Act, and MHRA.  The second theory relies on established precedent from the Eighth Circuit Court of Appeals in arguing that Metro Transit has shown a pattern or practice of discriminating against Segal and has denied him "meaningful access" to its services.  See Loye v. Cty. of Dakota, 625 F.3d 494, 496 (8th Cir. 2010).  The court will address these theories in turn.

### A. DOT Regulations

The first DOT regulation at issue states that, where buses for more than one route serve the same stop, "the [public] entity shall provide a means by which an individual with a visual

14

impairment or other disability can identify the proper vehicle to enter or be identified to the vehicle operators as a person seeking a ride on a particular route." 49 C.F.R. § 37.167(c). The other regulation states that public entities such as Metro Transit "shall ensure that personnel are trained to proficiency, as appropriate to their duties" so that they may safely and properly assist individuals with disabilities. Id. § 37.173.

Segal argues that the use of the word shall signals that these are mandatory requirements, and that a violation of these regulations constitutes a violation of the ADA, Rehabilitation Act, and MHRA. He further argues that Metro Transit has admitted to at least seventy-four violations of its Where to Stop policy, and thus has admitted to violating § 37.167(c). Finally, Segal asserts that it is clear from the repeated violations of Metro Transit's Where to Stop policy and Metro Transit's failure to adequately monitor its operators' compliance with its policies that Metro Transit has violated the training requirements of § 37.173.

Metro Transit argues that these DOT regulations do not set the standard for what constitutes a violation of the ADA, Rehabilitation Act, and MHRA. Rather, it contends, the proper standard to determine whether Metro Transit may be liable for

violations of these laws is whether it has denied Segal "meaningful access" to its services.[8]   The court agrees with Metro Transit.

There is a dearth is case law analyzing the DOT regulations at issue, and the court has not found — and the parties have not identified — any cases in which a court has determined that a violation of the regulations at issue here amounts to a violation of the ADA, Rehabilitation Act, or MHRA.   Segal, in effect, asks the court to construe these regulations — especially § 37.167(c) — as establishing strict liability for any violation.   A review of the regulatory framework and case law analyzing other disability-access related regulations reveals that such an interpretation is inappropriate.

In Alexander v. Choate, the Supreme Court recognized that there are "two powerful but countervailing" goals that courts must consider in situations such as this: "the need to give effect to the statutory objectives and the desire to keep [disability anti-discrimination laws] within manageable bounds."   469 U.S. 287, 299 (1985).   Following this line of reasoning, instead of attempting to prosecute every violation of DOT regulations, the DOT instead focuses its enforcement efforts on "failures to comply with basic requirements and 'pattern or practice' kinds of problems, rather

---

[8]   The "meaningful access" standard is discussed more fully below.

16

than on isolated operational errors." 49 C.F.R. Pt. 37, App. D.
If the court were to recognize every single violation of
§ 37.167(c) or § 37.173, courts could soon be flooded with lawsuits
and effective enforcement of these important anti-discrimination
laws would suffer.[9]

Such strict liability would also contravene the Eighth
Circuit's meaningful access standard used to determine whether
violations of the ADA, Rehabilitation Act, and MHRA have occurred.
As discussed more fully below, this standard does not require
perfection on the part of public entities such as Metro Transit.
Indeed, the Eighth Circuit and other courts analyzing ADA-related

---

[9] This discussion sets aside the court's belief that it is
questionable whether Metro Transit even truly violated the
regulations at issue. Section 37.167(c) requires Metro Transit to
provide "a means" by which disabled individuals can identify the
proper bus to board. Metro Transit does provide such a means via
its Where to Stop policy, and the court is not convinced that
violations of that policy equal per se violations of the ADA,
Rehabilitation Act, or MHRA. Cf. Tandy v. City of Wichita, 380
F.3d 1277, 1288 (10th Cir. 2004) (denying standing to a plaintiff
who established that bus operators "often fail[ed] to call out
stops" in violation of § 37.167(b) where the plaintiff's
likelihood of future injury was speculative because the public
entity, like Metro Transit here, trained its operators to call out
stops and had a policy for doing so). Further, recognizing that
Metro Transit has always trained its operators on ADA compliance,
and has implemented new and updated training to address Segal's
specific issues, combined with the fact that only two operators
were responsible for multiple violations after receiving coaching
on the matter, the court is not convinced that Metro Transit has
failed to train its operators to proficiency as required by
§ 37.173.

DOT regulations have declined to require such perfect compliance with DOT regulations.

In Midgett v. Tri-County Metropolitan Transportation District of Oregon, the Ninth Circuit Court of Appeals affirmed the district court's determination that the plaintiff had not established a violation of the ADA based on violations of DOT regulations. 254 F.3d 846 (9th Cir. 2001). There, the plaintiff submitted evidence of over thirty instances in which disabled passengers encountered issues with Tri-County's operation of wheelchair lifts on buses. Id. at 848. Relevant DOT regulations allowed for only isolated or temporary problems with wheelchair lifts. Id. at 849-50. Despite the DOT regulations allowing for only isolated incidents, and despite being presented with over thirty incidents from multiple passengers, the Ninth Circuit affirmed the determination that those instances did not establish that the defendant violated the ADA. Id. at 850.

In Loye, the plaintiff argued that Dakota County had violated a regulation requiring it to "ensure that communications with [disabled individuals] are as effective as communications with others." 625 F.3d at 499. There, plaintiff had been exposed to mercury contamination and Dakota County took steps to respond to the health emergency. Id. at 495. After addressing the immediate safety threat, Dakota County held a series of meetings to discuss

18

the health effects of mercury poisoning. _Id._ at 498. The plaintiff alleged that Dakota County failed to provide ASL interpreters at at least one of those meetings, thus violating the regulation requiring it to provide effective communication and, therefore, the ADA. _Id._ The Eighth Circuit rejected the plaintiff's literal reading of the regulation and, using the "meaningful access" standard discussed below, held that, because the plaintiff had access to the information provided at those meetings through other means, Dakota County had provided plaintiff with meaningful access to the information. _Id._ at 499. In rejecting the plaintiff's literal reading of the regulation at issue, the court explained that providing meaningful access does not require public entities "to produce the identical result or level of achievement for handicapped and nonhandicapped persons," but rather that these entities must "afford handicapped persons equal opportunity ... to gain the same benefit" to services provided) (quoting _Alexander_, 469 U.S. at 305–306).

The Supreme Court's recognition of the countervailing goals inherent in the disability anti-discrimination regulatory framework, as well as courts' rejections of a literal reading of disability anti-discrimination regulations, leads this court to conclude that what could be construed as literal violations of 49 C.F.R. §§ 37.167(c) and 37.173 nonetheless do not, without more,

constitute a per se denial of meaningful access to services for disabled individuals. The court, therefore, rejects Segal's theory that these DOT regulations impose strict liability on public entities required to adhere to them. Despite this determination, the court must still consider whether Metro Transit's actions, taken as a whole, have denied Segal meaningful access to its services.

### B. The ADA, Rehabilitation Act, and MHRA

As discussed above, the ADA, Rehabilitation Act, and MHRA prohibit public entities from discriminating against disabled persons and from denying them access to provided services. See 42 U.S.C. § 12132; 29 U.S.C. § 794; Minn. Stat. § 363A.12, subdiv. 1. Because the ADA and the Rehabilitation Act are substantively similar, "cases interpreting either are applicable and interchangeable for analytical purposes." Bahl v. Cty. of Ramsey, 695 F.3d 778, 783 (8th Cir. 2012). In addition, claims under the ADA and MHRA are also construed similarly. Id. (citing Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001)).[10]

---

[10] Segal argues in a footnote that the MHRA requires public entities to meet a higher standard because it requires them to "ensure physical and program access for disabled persons." ECF No. 61, at 12 n.8. The court is not convinced that requiring an entity to "ensure physical and program access for disabled persons" is different from prohibiting entities from excluding them from such access. Compare Minn. Stat. § 363A.12, subdiv. 1, with 42 U.S.C. § 12132. Segal does not cite any cases in support of this

To establish a violation under the ADA, the Rehabilitation Act, or the MHRA, Segal must prove that (1) he is a person with a disability, (2) Metro Transit is a public entity covered by the laws, and (3) he was denied the benefits of Metro Transit's services, programs, or activities because of his disability.  See Argenyi v. Creighton Univ., 703 F.3d 441, 447 (8th Cir. 2013). Neither Segal nor Metro Transit dispute that the first two elements are met here.

In determining whether Segal has been denied the benefit of a public service because of his disability, the court considers whether he received "'meaningful access' to a public entity's services, not merely 'limited participation.'"  Loye, 625 F.3d at 496 (quoting Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999)).  As noted above, the Eighth Circuit has determined that providing meaningful access does not require public entities to produce the same level of achievement between disabled and non-disabled individuals, but rather requires these entities to provide disabled individuals with an "equal opportunity ... to gain the same benefit" to services provided.  Loye, 625 F.3d at 499 (quoting Alexander, 469 U.S. at 305-306).

---

contention, and the court has been unable to find cases applying a heightened standard under the MHRA.  Accordingly, the court will follow current precedent applying the same standard between the MHRA and ADA.

Segal argues that when Metro Transit operators fail to comply with the Where to Stop policy, he is denied an "equal opportunity to gain the same benefit" as other passengers who can hear and see because he is unable to hear or see the route announcements and thus may unwittingly miss a bus that other passengers would not. Her further contends that he has established that Metro Transit has engaged in a pattern or practice of failing to comply with its Where to Stop policy.

In support of his argument, Segal cites to four cases in which courts have found that fewer incidents than are at issue here have established a pattern or practice of denying meaningful access. Two of these cases are inapposite, as the courts in those cases were either using a different standard from the Eighth Circuit's meaningful access standard or were deciding the case at the motion to dismiss phase. See Askins v. Metro. Transit Auth., No. 1:19-cv-4927-GHW, 2020 WL 1082423 (S.D.N.Y. Mar. 5, 2020) (determining that a rider who alleged violations of DOT regulations in approximately fifty percent of his bus rides could survive a motion to dismiss, but recognizing that establishing a denial of meaningful access requires a lesser showing at the motion to dismiss phase than it does on summary judgment); Reidy v. Cent. Puget Sound Transit Reg'l Auth., No. C13-536RSL, 2014 WL 7340373 (W.D. Wash. Dec. 22, 2014) (using a standard other than the Eighth

Circuit's meaningful access standard and giving weight to the fact that the public entity had been given permission to continue discriminating against the plaintiff and was thus not attempting to fix its actions).  The other two cases are also distinguishable from the instant case.

Segal first points to <u>Anderson v. Rochester-Genesee Regional Transportation Authority</u>, wherein the court determined that the defendant's denial of five to six percent of all paratransit trip requests showed a pattern or practice violative of DOT regulations and the ADA.  337 F.3d 201, 214-15 (2d Cir. 2003).  Here, considering all of Segal's complaints, Metro Transit operators violated the Where to Stop policy in approximately eight percent of Segal's rides.[11]  In <u>Anderson</u>, however, the court took into account complaints of denials of service from all riders, not just one individual rider.  <u>Id.</u>  If the court takes into account the total number of complaints submitted by disabled passengers — 300 complaints — and divides that by the total number of rides in a year — 51 million rides — those complaints would make up just

---

[11]  Dividing 150 complaints by 1,791 rides equals a total of 8.4%.  If the court were to consider only Segal's seventy-four verified complaints, that total would be 4.1% of rides.

0.000588% of rides offered by Metro Transit in a given year.[12] This number is well below the five to six percent deemed to establish a pattern or practice of violations in Anderson.

Next, Segal relies on Liberty Resources, Inc. v. Southeastern Pennsylvania Transportation Authority, which is similar to Anderson. 155 F. Supp. 2d 242 (E.D. Penn. 2001), vacated on non-merits grounds, 54 Fed. App'x 769 (3d Cir. 2002). There, the court determined that the defendant's denial of 2.8% of paratransit trip requests showed a pattern or practice violative of DOT regulations and the ADA. This determination, however, was rooted in an in-depth analysis of ADA provisions and DOT regulations specific to paratransit services that required the defendant to provide "a level of service which is comparable to the level of designated public transportation services provided to individuals without disabilities using such system," and laid out specific requirements for doing so. Id. at 253, 255. In coming to its conclusion, the court relied in part on the DOT's rejection of a ninety-eight percent performance standard as adequate to provide comparable service. Id. at 255. Here, there do not exist such detailed DOT regulations setting the standard for what constitutes

---

[12] This calculation ignores the fact that, as explained above, those 300 complaints were submitted over the course of multiple years, not just one year.

a pattern or practice of violating 49 C.F.R. §§ 37.167(c) and
37.173.[13]

Metro Transit argues, and the court agrees, that, putting
Segal's complaints into context makes it clear that Metro Transit
has not denied meaningful access to Segal or other disabled riders.
First, Metro Transit points to its efforts to bolster and enforce
its training and policies regarding providing service to disabled
passengers. Although the issues Segal complains of have not been
solved, the court recognizes that Metro Transit does continue to
revise and reinforce its training to ensure that its operators are
complying with relevant policies.

Further, as discussed above, Segal's total number of
complaints between September 22, 2016, and March 9, 2020, makes up
just eight percent of his rides, and his verified complaints make
up just four percent of his rides. From 2016 to 2019, Metro
Transit received 8,474 complaints from all passengers, both
disabled and non-disabled, regarding service at bus stops. Second
Ellingstad Aff. ¶ 15; Id. Ex. 44. The approximately 300 complaints

---

[13] The court also notes that Liberty Resources, Inc.
specifically cautioned against attempting to compare paratransit
services and fixed-route services such as those at issue here.
Id. at 256. This is because "comparing these systems is like
comparing apples and oranges because a constraint on a fixed route
system never results in a patron being denied a ride altogether,
absent an uncontrollable force." Id.

from disabled passengers, including Segal, during approximately that same time period equals just 3.5% of these total complaints. That means that non-disabled passengers submitted 96.5% of the complaints regarding service at bus stops.

As the court has previously stated, to comply with the ADA, Rehabilitation Act, and MHRA, Metro Transit must provide meaningful access to its disabled passengers. Meaningful access does not mean perfect service. When considering Segal's complaints within the context of the broader service that Metro Transit provides, it is clear that Metro Transit has not engaged in a pattern or practice of violating DOT regulations and that it has provided Segal with meaningful, albeit not perfect, access to its services.

**III. Damages and Injunctive Relief**

Because the court has determined that Metro Transit has not violated the ADA, Rehabilitation Act, or MHRA, the parties' arguments regarding damages and injunctive relief are now moot and the court declines to consider them.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1.    Metro Transit's motion for summary judgment [ECF No. 53] is granted;

    2.    Segal's motion for partial summary judgment [ECF No. 51] is denied; and

    3.    This case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  November 30, 2020        /s David S. Doty
                                      David S. Doty, Judge
                                      United States District Court